**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

SALLY J. PASSMORE and
PAULA J. THYFAULT,

       Plaintiffs,

v.                                Case No.  3:16-cv-1094-J-34PDB

21ST CENTURY ONCOLOGY, LLC,

       Defendant.

_____

## O R D E R

**THIS CAUSE** is before the Court on Defendant, 21st Century Oncology, LLC's

(21st Century) Motion for Summary Judgment as to Plaintiff Paula J. Thyfault, Doc. 39

(Thyfault Motion), and 21st Century's Motion for Summary Judgment as to Plaintiff Sally

J. Passmore, Doc. 40 (Passmore Motion), both filed December 28, 2018.[1]  Thyfault and

Passmore (collectively Plaintiffs) have filed responses to 21st Century's Motions, see

Response to Defendant's Motion for Summary Judgment as to Paula Thyfault, Doc. 46

(Thyfault Response), and Response to Defendant's Motion for Summary Judgment as to

---

[1] In support of its Motions, 21st Century submitted a variety of documents.  They include the following:  Doc. 41-1 (Thyfault Deposition); Doc. 41-2 (Thyfault 21st Century Job Application); Doc. 41-3 (Thyfault Proton Therapy Job Application); Doc. 41-4 (Thyfault Jacksonville Human Rights Commission Complaint, March 24, 2015); Doc. 41-5 (Thyfault Jacksonville Human Rights Commission Complaint, June 1, 2015); Doc. 41-6 (Thyfault Jacksonville Human Rights Commission Pre-interview Questionnaire); Doc. 41-7 (Thyfault Jacksonville Human Rights Commission Intake Notes); Doc. 41-8 (Passmore Deposition); Doc. 41-9 (Passmore 21st Century Job Application); Doc. 41-10 (Passmore Interrogatories); Doc. 41-11 (Passmore Jacksonville Human Rights Commission Pre-interview Questionnaire); Doc. 41-12 (Passmore Jacksonville Human Rights Commission Intake Notes); Doc. 41-13 (Schmidt Deposition); Doc. 41-14 (Kurz Deposition); Doc. 41-15 (Simmons Deposition); Doc. 41-16 (Paryani Deposition); Doc. 41-17 (Paryani Deposition Attachments); Doc. 41-18 (Burke Affidavit); Doc. 41-19 (Employee Handbook Excerpts); Doc. 41-20 (Burke Human Resources Notes); Doc. 42 (Burke Affidavit Attachments).

Sally Passmore, Doc. 47 (Passmore Response), both filed January 9, 2019.[2] Accordingly, this matter is ripe for review.

Plaintiffs Passmore and Thyfault brought the instant action against 21st Century, alleging violations of their rights under Title VII, 42 U.S.C. § 2000e, and the First and Fourteenth Amendments to the United States Constitution. <u>See</u> Doc. 7 (Amended Complaint). In their Amended Complaint, Plaintiffs assert that 21st Century discriminated against them when it terminated each of their employment based on their religious beliefs opposing abortion. <u>See</u> <u>generally</u> Amended Complaint at 1. Specifically, in the Amended Complaint they assert that 21st Century failed to accommodate them in their ability to express their religious beliefs (Count I), subjected them to disparate treatment and discrimination on the basis of their religious beliefs (Count II), and retaliated against them "for the protected expression of their religious beliefs. [(Count III)]." <u>Id.</u> at 1. 21st Century filed a Motion to Dismiss the Plaintiffs' Amended Complaint. <u>See</u> Doc. 11 (Motion to Dismiss). On April 11, 2018, the Court granted in part, and denied in part, that motion. <u>See</u> Doc. 29 (Order on Motion to Dismiss). The Court granted 21st Century's Motion to Dismiss Counts I and III of the Plaintiffs' Amended Complaint.[3] However, the Court denied the Motion to Dismiss with respect to Count II of the Plaintiffs' Amended Complaint. Following the close of discovery, 21st Century filed its Motions seeking summary judgment on this remaining claim and the Plaintiffs have responded.

---

[2] In support of their Responses to 21st Century's Motions, the Plaintiffs filed several documents. They include the following: Doc. 46-1 (Employee Handbook); Doc. 47-1 (Employee Handbook).

[3] In the Court's Order on Motion to Dismiss, it noted that the Plaintiffs' clarified that they were not seeking relief against their former employer on the basis of their First or Fourteenth Amendment Rights. As such, the Court did not address the merits of those claims, <u>see</u> Order on Motion to Dismiss at 13 n.7, nor does the Court do so in the instant Order.

## I.    Standard of Review

Under Rule 56, Federal Rules of Civil Procedure (Rule(s)), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Rule 56(a).  The record to be considered on a motion for summary judgment may include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."  Rule 56(c)(1)(A).[4]  An issue is genuine when the evidence is such that a reasonable jury could return a verdict in favor of the nonmovant.  See Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (quoting Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 919 (11th Cir. 1993)).  "[A] mere scintilla of evidence in support of the non-moving party's position is insufficient to defeat a motion for summary judgment."  Kesinger ex rel. Estate of Kesinger v. Herrington, 381 F.3d 1243, 1247 (11th Cir. 2004) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)).

The party seeking summary judgment bears the initial burden of demonstrating to the court, by reference to the record, that there are no genuine issues of material fact to be determined at trial.  See Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir.

---

[4] Rule 56 was revised in 2010 "to improve the procedures for presenting and deciding summary-judgment motions." Rule 56 Advisory Committee's Note 2010 Amends.

> The standard for granting summary judgment remains unchanged. The language of subdivision (a) continues to require that there be no genuine dispute as to any material fact and that the movant be entitled to judgment as a matter of law. The amendments will not affect continuing development of the decisional law construing and applying these phrases.

Id.  "[A]lthough the interpretations in the advisory committee['s] notes are not binding, they are highly persuasive."  Campbell v. Shinseki, 546 Fed. Appx. 874, 879 n.3 (11th Cir. 2013).  Thus, case law construing the former Rule 56 standard of review remains viable and applies here.

In citing to Campbell, the Court notes that "[a]lthough an unpublished opinion is not binding . . . , it is persuasive authority."  United States v. Futrell, 209 F.3d 1286, 1289 (11th Cir. 2000) (per curiam); see generally Fed. R. App. P. 32.1; 11th Cir. R. 36–2 ("Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority.").

1991). "When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593-94 (11th Cir. 1995) (citations and quotation marks omitted). Substantive law determines the materiality of facts, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248; see also McCormick v. City of Ft. Lauderdale, 333 F.3d 1234, 1243 (11th Cir. 2003) ("The mere existence of some factual dispute will not defeat summary judgment unless the factual dispute is material to an issue affecting the outcome of the case."). In determining whether summary judgment is appropriate, a court "must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." Haves v. City of Miami, 52 F.3d 918, 921 (11th Cir. 1995) (citing Dibrell Bros. Int'l, S.A. v. Banca Nazionale Del Lavoro, 38 F.3d 1571, 1578 (11th Cir. 1994)).

## II. Background[5]

### a. 21st Century, OnCure Medical Corporation, and The Florida's Women Center

Passmore and Thyfault worked as dosimetrists[6] for 21st Century, a radiation therapy center, in its Jacksonville, Florida location. Both women previously worked for

---

[5] The facts recited in this section are either undisputed, or any disagreement has been indicated. Because this case is before the Court on 21st Century's Motions, the facts recited herein, and all reasonable inferences therefrom, have been viewed by the Court in a light most favorable to the Plaintiffs. See T-Mobile S. LLC v. City of Jacksonville, Fla., 564 F.Supp.2d 1337, 1340 (M.D. Fla. 2008).

[6] A dosimetrist is a member of a radiation oncology team. See What is a Medical Dosimetrist?, AM. ASS'N OF MED. DOSIMETRISTS, https://www.medicaldosimetry.org/about/medical-dosimetrist/ (last visited May 30, 2019).

OnCure Medical Corporation (OnCure), which 21st Century acquired sometime in late 2013.  See generally Burke Affidavit at 1; Paryani Deposition at 4; Passmore Deposition at 9, 12, 13; Thyfault Deposition at 11; Passmore 21st Century Job Application; Thyfault 21st Century Job Application.[7]  Prior to her termination, Passmore had worked for OnCure and 21st Century for a combined eight years, with a total of thirty-two years dosimetry experience.  See Passmore 21st Century Job Application at 2.  Likewise, Thyfault worked for OnCure and 21st Century for a combined four years, with a total of twenty-five years dosimetry experience.  See Thyfault 21st Century Job Application at 2.  During their employment, neither woman had been disciplined or counseled in regard to fulfilling her specific work duties.  See Passmore Deposition at 14; Thyfault Deposition at 22.

Shyam Paryani, M.D., served as OnCure's Regional Medical Director prior to the purchase by 21st Century.  See Paryani Deposition at 4.  Between 2015 and 2017, Paryani served as a physician for 21st Century, but did not have a direct supervisory role over either Passmore or Thyfault.  Id. at 2, 6, 11.  He was also a partner in the property group that owned the medical complex where OnCure, and then 21st Century, had their offices.  Id. at 3.  Within that complex in a building adjacent to the OnCure/21st Century office, was The Florida Women's Center (The Center).  Id.; Burke Affidavit at 1.  Dr. Patrick Kelly ran The Center, which provided gynecological and abortion services.  Kelly and his practice was in no way associated with OnCure or 21st Century.  However, due to the physical proximity between the two facilities, they shared a common parking area.  See Paryani Deposition at 4, 5.  Paryani viewed Kelly as a neighbor and colleague,

---

[7] In citing to documents submitted by the parties, the Court will refer to the assigned CM/ECF page numbers for those documents.  Thus, where a deposition transcript is filed as a mini-script with four transcript pages on one record page, the Court has cited to the record page as numbered by the CM/ECF docketing system rather than the transcript page.

especially given the fact that the two medical entities shared a parking lot.  Id. at 5.

Because parking availability in the front of both medical centers was limited, the employers directed staff for both practices to park behind their respective building so that the parking spaces in front of the buildings could be used by patients.  Id. at 4; Burke Affidavit at 1.  Maintenance of this parking policy also may have been warranted by events that occurred when Paryani was OnCure's Regional Medical Director.  Two OnCure employees, Henderson and his wife, both of whom oppose abortion, would purposely park their cars in front of OnCure, prominently displaying "choose life" license plates in the direction of The Center.  See Paryani Deposition at 4.  See also Simmons Deposition at 6; Thyfault Deposition at 21.[8]  Kelly objected to this practice, and staff for both organizations were reminded to park their vehicles in the back of the buildings, rather than the front.  Paryani Deposition at 4.

During Plaintiffs' employment, 21st Century had an Employee Handbook detailing the company's polices, practices, and procedures.  The Employee Handbook stated that its purpose was to ensure that all employees "are treated in a consistent and fair manner and that all personnel policies are interpreted the same by all Company employees affected."  Employee Handbook at 10.  The Employee Handbook also stated that employees "found to have committed a violation [of the handbook's terms] . . . will be subject to disciplinary action, that may include termination of employment with the Company."  Id. at 15.  Notably, it cautioned that "the Company reserves the right to administer appropriate disciplinary action for all forms of disruptive and/or inappropriate behavior.  Each situation will be dealt with on an individual basis."  Id. at 31.  Finally, the

---

[8] On the weekends, the Hendersons participated in anti-abortion marches, along with Passmore.  Sometimes Thyfault joined them.  See Simmons Deposition at 6; Thyfault Deposition at 21.

Employee Handbook explained that

> [l]isting all forms of behavior that are considered unacceptable in the workplace is not possible. The following are examples of serious infractions of rules of conduct that may result in disciplinary action, up to and including immediate termination of employment without the issuance of progressive discipline. The list is not all-inclusive, but is intended to give employees some examples of unacceptable conduct and behavior . . . .

Id. at 32-33. Included among the examples of unacceptable conduct listed in the Employee Handbook were Rule 13, "[n]egligence or any careless action that endangers the life or safety of another person," id. at 33; Rule 16, "[e]ngaging in criminal conduct or acts of violence, or making threats of violence toward anyone on Company premises or when representing the Company," id.; and Rule 23, "[f]ailing to conduct oneself in a professional manner, including general conduct in the workplace; language; respect for co-workers, patients, and vendors; and general office demeanor." Id. at 34.

The Employee Handbook also included a prohibition against harassment, a prohibition against workplace violence, and polices regarding the use of social media. Id. at 18, 20, 37. In particular, the harassment policy stated that the company would "not tolerate any actions by its employees (or its guests) that harass, disrupt or interfere with an employee's work performance or which create an intimidating, offensive or hostile work environment." Id. at 18. The workplace violence policy stated that

> 21st Century Oncology prohibits any violent acts, and threats of violence against co-workers, visitors, patients or any other persons who are either on Company premises or who have contact with employees in the course of their duties.

> An employee can be discharged or otherwise disciplined for misconduct where the employee has performed an intentional act which caused, or had the potential of causing, physical injury or property damage, or where the employee committed an act which, although unintentional, was in reckless disregard for the safety of others or of property.

Id. at 20.  Finally, the Employee Handbook's social media policy counseled employees to remember that "what is posted can be tracked, traced and is permanent.  When employees . . . contribute to any . . . online media . . . , they are impacting their personal image and potentially impacting the Company."  Id. at 37.  As such "[w]hile each employee is responsible for the content they publish, all Company policies regarding off-duty conduct will apply to social media activity.  This will include but not be limited to policies related to anti-harassment, non-discrimination, code of conduct, HIPAA and protecting confidential proprietary information."  Id.  The social media policy included in the Employee Handbook also directed that "Company employees may not engage in social networking during working hours, when on company property, through the use of cell phones or through use of Company computers and other electronic property."  Id.

### b.  Encounters between Passmore and Kelly

During Passmore's employment with OnCure and then 21st Century, she had several encounters with Kelly.  Passmore is a Baptist and strongly opposes abortion. Passmore Deposition at 5-6; Passmore Interrogatories at 2.  See also Kurz Deposition at 2; Schmidt Deposition at 3.  Sometime in 2010, Passmore had a pro-life sign in her van window, which she received from Thyfault, and brought to work to return to her.  See Paryani Deposition at 6; Passmore Interrogatories at 17.  The sign read "Stop legalized baby killing."  See Passmore Deposition at 14.  Passmore parked her van in such a way that the sign in her window was visible to patients going into Kelly's practice.  See Burke Affidavit at 1; Passmore Deposition at 14-15.  Passmore intended to take the sign out of the van window prior to Kelly's arrival, but got busy at work, and failed to do so.  See Passmore Interrogatories at 17.  When Kelly saw the sign in Passmore's van, he came

into the OnCure office and asked to speak to the owner of the van. Id.; Passmore Deposition at 15. Passmore stated that when she went to meet with Kelly, he "started yelling in [her] face about one foot away . . . [h]e was so angry," and threatened that he would have her fired. Passmore Interrogatories at 17; Passmore Deposition at 15. Kelly demanded that Passmore remove the sign from her van. Passmore Deposition at 15. Passmore complied and because she was afraid that Kelly would inform Paryani of the incident, she told only a few people about it. Id. See also Schmidt Deposition at 4; Thyfault Deposition at 22.

Several months later, Passmore had a sign in the form of a sunscreen in her van indicating her support for military veterans. See Passmore Interrogatories at 17. Kelly saw Passmore's van parked in front of OnCure and The Center, and contacted Paryani with his ongoing concerns about Passmore's parking and vehicle signage. See Paryani Deposition at 6. Paryani met with Passmore, who denied having an anti-abortion sign in her car. Id. at 6-7. Paryani nonetheless scolded Passmore, reminding her that she should park in the back of the building and that she should not put any signs in her van, as doing so would irritate Kelly. Id. at 7; Burke Affidavit at 1; Passmore Interrogatories at 17; see also Paryani Deposition at 5. According to Passmore, Paryani told her that "[w]hat [she] wanted to do on [her] own time was fine, but not on [Paryani's] property." Passmore Deposition at 15. Henderson was present when Paryani counseled Passmore, and soon thereafter told Passmore that if she had any further disagreements with Kelly, Paryani "would not hesitate to fire her on the spot." Passmore Interrogatories at 17; Passmore Deposition at 15.

In the spring of 2014, after 21st Century had acquired OnCure, a group of anti-

abortion protesters obtained permission from a landowner adjacent to the medical complex where both 21st Century and The Center were located, to come on to that individual's land and protest Kelly's clinic.  <u>See</u> Burke Affidavit at 2; Passmore Deposition at 16; Passmore Interrogatories at 17.  The protesters "could be viewed from behind the fence that divided the private property from the office complex . . . ."  Burke Affidavit at 2; Passmore Interrogatories at 17.  Kelly called the police on numerous occasions to complain about the protesters.  <u>See</u> Passmore Interrogatories at 17.

Passmore would sometimes speak to the protestors as she was arriving at or leaving from work, telling them that Kelly would continue to call the police.  <u>Id.</u>; <u>see also</u> Passmore Deposition at 16.  Passmore believed that Kelly "was certain that [she] was the organizer . . . over the pro lifers," despite her assertions otherwise.  Passmore Interrogatories at 17; Passmore Deposition at 16.  Worried that Kelly might call Paryani again, and to avoid conversations with the protesters, Passmore stated that she

> began parking again in front of [the] office.  I used sunscreens [in my van] almost every day, front and side just carboards to fit the windows to keep [my] van cool.  One day Dr. Kelly called Dr. [Paryani] to tell him I had more signs in my car and he was mad.  Dr. [Paryani] called me to his office . . . [and] scolded me again.  Dr. [Paryani] told me to park in back, keep away from Dr. Kelly, never upset him or even let him see me.

Passmore Interrogatories at 17; Passmore Deposition at 16-17.

In May of that same year, while standing outside of work, Passmore observed Kelly taking pictures over the fence where the protesters often congregated.  Passmore Interrogatories at 17.  Forgetting that she had been admonished not to interact with Kelly, she greeted him in some manner and Kelly approached her.  <u>Id.</u> at 17-18.  Passmore reported that

> he was again in my face . . . taking picture after picture of me saying over

and over while picture after picture, "you put these people up to this didn't you? I know you did. I know you did[,]" over and over saying the same thing. I was taken back by his behavior, I tried to say no but he continued the picture taking. At the time, I started to say "If you think you can accuse me of the activities, you are wrong." However, I only spoke the first few words "If you think you can" [and] then he started saying over and over and over "Are you threatening me? Are you threatening me? I think you are threatening me[,]" while taking more pictures at the same time. I told him at the same time that I would pray for him.

Id. at 18.

In response to the protesters on the adjacent property, Kelly sought permission from Paryani and the other owners of the complex to build a privacy fence between The Center and the private land where the protesters regularly congregated. See Paryani Deposition at 7. Kelly advised that a fence was necessary because the protestors would verbally accost his patients, and a fence would prevent them from doing so. Id. Upon receiving permission to build the fence, Kelly began his work, but in doing so, had additional encounters with Passmore.

During the late spring or summer of 2014, Kelly called the police reporting that Passmore threatened him. See Passmore Interrogatories at 18. According to Kelly, Passmore yelled to Kelly that he had "better watch out." Burke Affidavit Attachments at 17.[9] Passmore flatly denies she threatened Kelly in any manner. See Passmore Interrogatories at 18.

On a weekday in August 2014, Passmore left the office to get something out of her van. See Passmore Deposition at 17; Passmore Interrogatories at 18. At that time, Kelly was outside, standing on a ladder by his truck. Passmore Deposition at 17; Passmore

---

[9] At some point, Kelly also reported to Paryani that Passmore "expressly told me that something was going to happen to me and that she could make it happen." Paryani Deposition Attachments at 2. However, the record does not reflect the date when Passmore allegedly made this statement.

Interrogatories at 18.  Passmore reported that "Kelly immediate[ly] started taking pictures of me over and over.  I opened my [van] door, and my camera was on [the] seat, so I took picture[s] of him and [then] returned to [my] desk.  I wanted pictures if something happened to my van . . . ."  Passmore Interrogatories at 18.  Passmore further reported that she took pictures of Kelly "because I was so afraid of him.  I didn't know what he was going to do.  He could hurt my van, me, or my family."  Passmore Deposition at 17, 21.

Soon thereafter, Passmore came into work on a Sunday, outside of her assigned work schedule.  See Passmore Interrogatories at 18.  She left the office at some point to get something out of her van, and Kelly "scared [her] to death" because he

> sped around the corner of [the] building partially blocking [the] front of [her] van taking pictures over and over.  [She] went to [the] back side of [her] van to open [the] driver door.  Kelly sped to [the] back of [the] van partially blocking the back corner of the van, again taking pictures.

Passmore Interrogatories at 18; Passmore Deposition at 17.  Passmore stated she was "very afraid" and not sure whether or not Kelly would kill her.  See Passmore Interrogatories at 18; Passmore Deposition at 17.  She was so scared that she called the police, but the officer who came to the scene told her that because she had not been hurt and Kelly had made no threats, the officer could not file a report.  See Passmore Deposition at 17; Passmore Interrogatories at 18.

Kelly reported the two August incidents to Kathy Burke, the Vice President of Operations for 21st Century.  Burke Affidavit at 1-2.  Kelly shared with Burke the on-going tensions between himself and Passmore, his belief that Passmore was instrumental in organizing the protesters on the adjacent property, and that he thought she was dangerous.  Burke Affidavit at 1-2; Burke Affidavit Attachments at 18.  Kelly further reported to Burke that "Passmore often picketed outside his office on the weekends,

yelled to him 'you better watch out,' and often moved her car around the parking lot between the two offices multiple times per day to loudly play religious music through her car stereo." Burke Affidavit at 1.

In regard to the August weekday photograph incident, Kelly reported that Passmore had exited the building and taken pictures of Kelly while he was working on the fence, waved at him, and then after returning her camera to her vehicle, waved at him again. <u>See</u> Burke Affidavit at 2; Burke Affidavit Attachments at 18. Likewise, in relation to the Sunday incident, Kelly told Burke that several people were in the office parking lot, including Passmore, and he asked them to leave. Burke Affidavit at 1.

Kelly also informed Burke that he had filed a police report against Passmore and "requested that the state attorney's office open a file on Ms. Passmore because he viewed her as a dangerous and a viable physical threat." <u>Id.</u> In response, Burke "advised Dr. Kelly that [she] would look into his complaints, but what Ms. Passmore did on her personal time was her business and would not affect her employment at [21st Century] unless she was found to be in violation of [21st Century's] policies." <u>Id.</u> at 1-2.

On September 10, 2014, Burke met with Passmore. Prior to their meeting, Burke reviewed security footage provided by Kelly that showed Passmore standing at her van, taking a photograph of Kelly, waving at him, and then walking away. The date and time stamps on the video indicated that Passmore did so while she was clocked in at work. <u>Id.</u> at 2. During her meeting with Passmore, Burke asked if Passmore had taken any pictures of Kelly during work hours. Passmore denied doing so, but then admitted otherwise after Burke informed Passmore that she had observed security video of the incident. <u>See</u> <u>id.</u>; Burke Affidavit Attachments at 20.

Passmore relayed the Sunday incident with Kelly to Burke.  Burke counselled Passmore that she should

> stop engaging in personal activities [during work hours] and to just stay clear of Dr. Kelly during work time and while on company property.  [Burke] directed Ms. Passmore to ensure her car was parked at the back of the [21st Century] building . . . at all times.

Burke Affidavit at 2; Burke Affidavit Attachments at 20-21; Passmore Deposition at 17-18; Passmore Interrogatories at 18.  She also "reminded . . . Passmore that she should not be working on weekends without prior approval."  Burke Affidavit at 2.  Passmore agreed to comply with Burke's directions, although she stated that Kelly was wrong in asserting that Passmore was in charge of the protesters, and that "he could twist and frame everything to make it look like [Passmore] was purposefully harassing him when it was the other way around."  Passmore Deposition at 18; see also Burke Affidavit at 2; Burke Affidavit Attachments at 21.

Passmore told Thyfault about her encounters with Kelly.  Thyfault Deposition at 22.  While Thyfault could not remember everything Passmore shared with her,  she did recall that because of Passmore's interactions with Kelly, supervisors had directed Passmore not to park in front of the building and not to talk to Kelly.  Id.

### c.  The September 2014 recording incident and its aftermath

On September 5, 2014, Passmore left her desk to use the bathroom.  From inside the building she observed the parking lot shared by 21st Century and The Center and saw "a young lady being transported out of Dr. Kelly's office on a gurney by Jacksonville Fire and Rescue.  Another young lady was pacing back and forth next to [the] patient and near the truck on a cell phone crying and very emotional."  Passmore Interrogatories at

19; Passmore Deposition at 18. Passmore asked Thyfault to join her and to record the event on her phone. Passmore Deposition at 18; Passmore Interrogatories at 19. Another employee, Tracy Kurz, also had gone to the bathroom and saw the ambulance in the parking lot. Kurz Deposition at 3. Kurz told her colleagues "what was going on," and several of them came to watch. Id.

At Passmore's suggestion, Thyfault recorded the events unfolding in the parking lot "until the rescue [vehicle] drove away." Passmore Interrogatories at 19; Passmore Deposition at 18. While Thyfault recorded what was happening outside, she and Passmore commented to one another as to what they were observing. Passmore later confirmed that she could be heard on the video stating "Oh, my God," Passmore Deposition at 22, "She's crying," id. at 23-24, "Where is that bastard," id. at 23-24, "That's what you get for not finding out what you're doing," id. at 24, "Thank you Paula. Can we put it online?", id. "Uh-oh, is she crying?", id., "Will I get in trouble?", id., "She should take a picture," id., and "I could lose my job if I go out there and hug her neck." Id. Passmore also confirmed that Thyfault could be heard on the video stating "Can you hear what they're saying?" Id. at 23.

In her deposition, Passmore explained that she asked Thyfault to film the events in the hope that they could "help the young lady on the stretcher, whose life would be changed forever if she survived." Passmore Deposition at 18. She nonetheless acknowledged that she did not think "it would be ok for someone to film one of her patients in a medical distress situation without their knowledge." Id. at 19. Thyfault stated that she had no specific intent when she recorded the distressed patient except perhaps to gather proof that Kelly was hurting women. See Thyfault Deposition at 24. Thyfault is Catholic

and active with pro-life groups in Jacksonville, Florida. <u>Id.</u> at 7, 21.

While Thyfault was filming the patient, the women did not leave the 21st Century building because Passmore stated she knew that if she did so, she would be fired due to her ongoing conflict with Kelly. <u>See</u> Passmore Deposition at 18. Likewise, Thyfault later stated that she did not feel "that comfortable" leaving the building to film the events outside in the parking lot. <u>See</u> Thyfault Deposition at 25. Rather, she was "just taking a little video and going back to work." <u>Id.</u>

Two other 21st Century employees, Tracy Kurz and Jaime Schmidt, joined Passmore and Thyfault to watch the patient being transported away in the emergency vehicle. Kurz Deposition at 3-4; Schmidt Deposition at 5.[10] Neither Kurz nor Schmidt recorded the event. Kurz Deposition at 4; Schmidt Deposition at 5. Both Kurz and Schmidt stated they personally oppose abortion, and Schmidt stated she was Catholic. Kurz Deposition at 3; Schmidt Deposition at 3, 4. The women also knew that both Passmore and Thyfault opposed abortion. Kurz Deposition at 2; Schmidt Deposition at 3.

Soon after the incident, Thyfault shared the video with Brett Breukenhoffer, an anti-abortion activist. <u>See</u> Passmore Deposition at 18; Passmore Interrogatories at 19; Thyfault Deposition at 24. She also informed Passmore that she had done so. Passmore Deposition at 18. Nevertheless, Passmore testified that it was not until December of 2014 that she and Thyfault learned that the video had been posted on an anti-abortion website. <u>See</u> Passmore Deposition at 19, 26-27; Passmore Interrogatories at 19. Passmore and

---

[10] While Thyfault was taking the video, Kurz occasionally responded to some of the dialogue between Passmore and Thyfault. <u>See</u> Kurz Deposition at 5; Passmore Deposition at 24. However, she is not heard commenting on the patient, her condition, or Kelly.

Thyfault denied any knowledge regarding who maintained the website upon which the video was posted.  See Passmore Deposition at 23; Thyfault Deposition at 24.

On January 22, 2015, Kelly contacted Paryani informing him that Kelly had "verified that a video was made from inside [21st Century's] building showing [Kelly's] patients and staff[,] accompanied by a defamatory dialogue against [him] and [his] business."  Paryani Deposition Attachments at 5.  Kelly also stated that the video had been published on the Internet.  Id.  Kelly followed up with a message to Paryani advising that he had learned more about the website upon which the video was posted.  Id. at 1-2.  Kelly's investigation uncovered that the video was published by a woman who was "convicted and served 2 years in a federal prison for conspiring to bomb an abortion clinic."  Id. at 1.  Kelly went on to state that he thought Passmore was involved in the posting of the video on the Internet, and that he was concerned that he, along with his patients, were under a "real threat of violence due to the actions and statements of . . . Passmore and ongoing dissemination of what [he] consider[ed] defamatory information . . . ."  Id. at 2.  Paryani forwarded Kelly's communications to Burke, stating that upon her review, they needed to consider "next steps."  Id. at 1.  See also generally Paryani Deposition at 9-10.

Kelly also contacted Burke, sharing with her the same information he shared with Paryani, and reiterating his concerns for the safety of his staff and patients.  See Burke Affidavit Attachments at 22-24.  Kelly advised that Paryani had confirmed to him that the video was taken from 21st Century's location.  Id. at 23.  Kelly characterized the video and its posting on the Internet as "video stalking" and stated that "I can only take so many security measures within my control . . . [and] you need to consider the employees involved in this activity dangerous as I surely do."  Id.  Kelly noted that the "video taken

from inside [the 21st Century] office was . . . provided to a known felon convicted for violence relating to abortion facilities." Id. at 22. He also stated that due to Passmore's ongoing behaviors, "an atmosphere of fear has been created within our complex that is unacceptable. This recent event has amplified it . . . ." Id. at 23. Kelly further asserted that the video violated the privacy of his "office and patients, [and interfered] with the operations of [his] medical practice." Id. He concluded stating

> [i]n light of the threats of future harm I have informed you of and filed a police report on that were made personally to me by . . . Passmore . . . , I suggest you research this cohort thoroughly and take proactive assurances to preclude any future involvement of your office or company. For the safety of my patients and staff and to enhance my ability to protect against what I consider a threat of violence due to the actions and statements of your employee and ongoing dissemination of what I consider defamatory information, I also request you make time to inform me of the status of this ongoing problem.

Id. at 22. See also Burke Affidavit at 2.

Burke forwarded Kelly's communications to Diane Cooke, 21st Century's Regional Human Resources Director, and Burke and Cooke initiated an investigation into the video. See Burke Affidavit at 2. They found the video posted on YouTube as well as on an anti-abortion website. Id. The YouTube posting was titled "Sobbing, Scared Abortion Patient Transported to Hospital" and included a description stating: "September 4, 2014: A crying and scared abortion patient was transported to a hospital from Florida Women's Center in Jacksonville, Florida. Owner and abortionist: Patrick J. Kelly. One month before this, Kelly was cited for failing to train staff for medical emergencies." Id. The title for the video posted on the anti-abortion website was "Missing 911 call: Ambulance rushes sobbing abortion patient from shoddy Florida clinic." Id. Cooke and Burke viewed the video, which included the superimposed voice of a narrator. They could also hear additional voices in

the video, one of which they believed to belong to Passmore.  Id.

On January 28, 2015, Burke had individual meetings with Passmore and Thyfault. At each meeting, Tracey Simmons, 21st Century's Regional Director, was present as a witness, and Cooke was present by phone.  See id.; Burke Affidavit Attachments at 26; Simmons Deposition at 2.  During her meeting, Passmore admitted that she and Thyfault observed the ambulance taking a patient away from The Center, and that Thyfault recorded the incident.  Burke showed Passmore the video, and Passmore confirmed that, aside from the voice of the narrator, the other voices on the video belonged mainly to her and to Thyfault.  See Burke Affidavit at 2; see also generally Passmore Deposition at 20. Although in her meeting with Burke, Passmore initially denied "knowledge of how or who placed the video on the Internet," see Burke Affidavit Attachments at 26, in her sworn interrogatory responses as well as her deposition, Passmore admits that Thyfault had informed Passmore that Thyfault had shared the video with anti-abortion activist Brett Breukenhoffer.  During the interview, Passmore did confirm that the recording occurred during work time and at the 21st Century offices.  Id.  Burke explained to Passmore that "this was a serious event that took place during work hours and at a place of work," and that Passmore was immediately suspended while Burke and her colleagues completed their investigation.  Id.  See also generally Passmore Interrogatories at 19.  Simmons stated she recalled that Burke's reason for suspending Passmore was because Passmore took the "video on company time and it was posted on the internet . . . ." Simmons Deposition at 2, 6.  Additionally, Burke noted that she had already counselled Passmore several times about not harassing Kelly.  Id. at 4.

Burke and her colleagues also interviewed Thyfault, again with Simmons serving

as a witness, and Cooke on the phone. Burke Affidavit at 3; Burk Affidavit Attachments at 26; Simmons Deposition at 2. Thyfault admitted to taking the video with her cell phone, but at the time denied "any knowledge of how the video ended up on the internet." Burke Affidavit at 3. Burke recalled that Thyfault was very angry during the meeting. Id.; see also Simmons Deposition at 8. Thyfault stated she was concerned that "they are killing future population[s] and killing future patients" and "[i]t is destroying our country." Burke Affidavit Attachments at 26. When Burke advised Thyfault that "This is very serious," Thyfault responded "Yes, it is. This man is over there killing babies and hurting women. It's very serious." Thyfault Deposition at 23. While Thyfault could not remember the exact words exchanged between herself and Burke, she nonetheless stated

> something like . . . "My belief and my faith tells me that . . . you shall not kill and . . . when the only way for evil to survive is when good people stay silent." [Burke] said her beliefs were different than mine. That's all I remember, and then she told me not to go back to work.

Thyfault Deposition at 23; see also Burke Affidavit at 3; Burke Affidavit Attachments at 26. Further attempting to recall the conversation, Thyfault stated

> [m]y exact words I'm sure I can't recall, but like I said, it was we know that he is killing babies and hurting women and my faith tells me that that needs to be exposed. [Burke] said "Well, not everybody believes the same as you and don't go back to your work."

Thyfault Deposition at 26. In contrast, Burke states that "[n]o one discussed religion or religious beliefs during this meeting." Burke Affidavit at 3. Simmons also stated that she did not recall any discussion about people having different religious beliefs during the meeting. Simmons Deposition at 2, 4, 8.[11] However, Simmons did recall that the reason Burke and Cooke gave for suspending Thyfault was because she took the video on

---

[11] For purposes of resolving the Motions, the Court accepts Thyfault's description of the statements made in the meeting.

company property.  Id. at 3, 6.

After Thyfault left the meeting, Thyfault called Simmons and informed her that Kurz and Schmidt also observed the ambulance transporting the patient from The Center.  See Burke Affidavit at 3; Burke Affidavit Attachments at 26.  Burke then met with Schmidt, again with Simmons present at the meeting, and Cooke on the phone.  Schmidt

> confirmed that [Passmore] was returning from the back of the building and called [Thyfault] to get her cell phone as there was an ambulance taking someone from Dr. Kelly's office.  All three, [Thyfault, Kurz, and Schmidt,] went to the window to see what was going on.  [Thyfault] began recording the incident with her cell phone while [Schmidt] and [Kurz] just observed the outside activity.   [Thyfault] and [Passmore] were commenting while [Thyfault] was videoing. [Schmidt] and [Kurz] only watched for a brief period of time, [then] went back to work.  [Schmidt] stated that she and [Kurz] were just "being nosey."

Burke Affidavit Attachments at 25; see also Burke Affidavit at 3; Schmidt Deposition at 5-6.  Schmidt denied playing any role in taking the video.  Burke Affidavit at 3.[12]

Having reviewed the video and interviewed the relevant parties, Cooke and Burke determined that while all the employees involved

> had witnessed the incident during work hours, only Ms. Passmore had directed Ms. Thyfault to film the medical emergency, only Ms. Thyfault had filmed it, and only Ms. Passmore and Ms. Thyfault had made audible comments on the video about the patient's condition and reason to transport to another medical facility.  In addition, Ms. Passmore had been previously warned not to engage in personal activities (such as taking pictures or commenting on video recordings) during work time while on company property.  It was also determined that while she denied that she posted the video on-line, Ms. Thyfault was at least complicit in posting the video to the internet due to the fact that she admitted to taking the video and that it was taken on her personal cell phone.

---

[12] Burke and her colleagues did not interview Kurz.  At the time of their investigation regarding the video, Kurz was on leave from work to study for a professional certification.  Burke Affidavit at 3; Kurz Deposition at 4; Simmons Deposition at 3. Based on the information Burke and her colleagues received from Schmidt, and given that Kurz was currently out of the office, the women determined it was not necessary to interview Kurz.  Burke Affidavit at 3.

Burke Affidavit at 3. Cooke and Burke further determined that Passmore and Thyfault's actions violated several of 21st Century's policies and work rules, as detailed in the Employee Handbook.

In particular, they determined that Passmore and Thyfault violated the company's policies regarding harassment, work place violence, and use of social media. Id. at 3; see also Employee Handbook at 18, 20, 37. In this regard, they concluded that Passmore and Thyfault's actions violated the privacy rights of Kelly's patient, by virtue of their comments on the video "which identified the medical facility that patient was visiting and [their speculation] as to the reason for her visit." Burke Affidavit at 3. Additionally, because of the nature of the women's comments on the video as to the patient's condition, they potentially "put Dr. Kelly's office staff and patients in jeopardy." Id. Burke and Cooke also took issue with Passmore and Thyfault engaging in conduct that "resulted in a patient's medical emergency being captured on video and then disseminated on-line for all to see." Id.

Burke and Cooke also determined that Passmore and Thyfault violated a number of work rules set forth in the Employee Handbook, the violation of which could warrant "immediate termination of employment without the issuance of progressive discipline." Burke Affidavit at 3; Employee Handbook at 32-33. Burke and Cooke identified Rule 13 ("negligence or any careless action that endangers the life or safety of another person"), Rule 16 (engaging in "criminal conduct or acts of violence, or making threats of violence toward anyone on Company premises or when representing the Company"), and Rule 23 ("failing to conduct oneself in a professional manner, including general conduct in the workplace; language; respect for co-workers, patients, and vendors; and general office

demeanor."). <u>See</u> Burke Affidavit at 3; Employee Handbook at 33-34.

Based on the information Burke and Cooke gathered in their investigation, Cooke, as 21st Century's Regional Human Resources Director, made the decision that Passmore and Thyfault's employment should be terminated. <u>See</u> Burke Affidavit at 3; Burke Affidavit Attachments at 27. Burke stated that "[n]either Ms. Passmore nor Ms. Thyfault were terminated because of their religion or their religious beliefs." Burke Affidavit at 4. Indeed, Burke asserted that at no time was she aware of the religion of either woman. <u>Id.</u> Although Burke acknowledged knowing that Thyfault was "pro-life," she asserted that she had no knowledge of Passmore's "views on abortion" as the two had not discussed the topic. <u>Id.</u> However, the history of conflict between Kelly and Passmore of which Burke was aware certainly would have suggested to her that Passmore opposed abortion. Thus, the Court accepts that Burke was aware of Passmore's opposition to abortion.

On January 29, 2015, Burke and Cooke contacted Passmore by telephone and informed her that she was terminated. <u>See</u> Burke Affidavit at 3; Burke Affidavit Attachments at 27. During the phone call, Burke and Cooke advised Passmore that 21st Century

> was terminating her for violating a number of 21st Century's policies including, but not limited to (1) violation of the privacy rights of Dr. Kelly's patient (through her comments on the video which identified the medical facility that [the] patient was visiting and speculated as to the reason for her visit) and (2) for making dangerous and unfounded speculation on the video as to the nature of the patient's condition which could put Dr. Kelly's office staff and patients in jeopardy.

Burke Affidavit at 3. Nevertheless, Passmore "never received any written documentation about the actual results of the investigation and the true reason for termination." Passmore Interrogatories at 19; <u>see</u> <u>also</u> <u>id.</u> at 5, 22.

Burke and Cooke also attempted to contact Thyfault to inform her that she was terminated from her position.  Burke Affidavit Attachments at 27.  After leaving two messages on Thyfault's phone asking that she return their calls, Burke and Cooke again called Thyfault and left a message stating that they had completed their investigation and that Thyfault was no longer employed with 21st Century.  See Burke Affidavit at 3-4; Burke Affidavit Attachments at 27.  In detailing the reasons why Thyfault was being terminated, Burke and Cooke reiterated the reasons stated for Passmore's termination, and also added that Thyfault violated the patient's privacy by videotaping the patient leaving Kelly's office.  See Burke Affidavit at 3-4.  Burke then contacted Kelly, informing him of the outcome of the investigation.  He thanked Burke and "stated he was really concerned for the safety of him, his employees and patients."  Burke Affidavit Attachments at 27.

### III.    Applicable Law

Title VII provides that an employer may not "discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  See 42 U.S.C. § 2000e–2(a)(1). The term "Religion" as used in the statute includes:

> [a]ll aspects of religious observance and practice as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business.

See 42 U.S.C. § 2000e(j).  A plaintiff may establish a disparate treatment discrimination claim through the introduction of direct or circumstantial evidence.  Lee v. U.S. Steel Corp., 450 Fed. Appx. 834, 839 (11th Cir. 2012) (citing Alvarez v. Royal Atl. Developers, Inc., 610 F.3d 1253, 1264 (11th Cir. 2010)). "Direct evidence is that which shows an

employer's discriminatory intent 'without any inference or presumption.'" Hinson v. Clinch Cnty., Ga. Bd. of Educ., 231 F.3d 821, 827 (11th Cir. 2000) (quoting Standard v. A.B.E.L. Servs., Inc., 161 F.3d 1318, 1330 (11th Cir. 1998)). However, "only the most blatant remarks, whose intent could be nothing other than to discriminate" will constitute direct evidence of discrimination. Carter v. City of Miami, 870 F.2d 578, 582 (11th Cir. 1989). If a plaintiff is unable to point to direct evidence of discrimination, the Court applies the burden-shifting framework articulated in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Alvarez, 610 F.3d at 1264; Hawkins v. Potter, 316 Fed. Appx. 957, 960 (11th Cir. 2009). Under the McDonnell Douglas framework, the plaintiff bears the initial burden of establishing a prima facie case of discrimination by showing that "(1) she is a member of a protected class; (2) she was subjected to an adverse employment action; (3) her employer treated similarly situated employees outside of her protected class more favorably than she was treated; and (4) she was qualified to do the job." Burke–Fowler v. Orange Cnty., Fla., 447 F.3d 1319, 1323 (11th Cir. 2006). If the plaintiff presents a prima facie case of discrimination, that evidence "creates a presumption that the employer unlawfully discriminated against the employee," and the burden of production then shifts to the employer to offer a legitimate, non-discriminatory reason for the adverse employment action. Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254–56 (1981); Alvarez, 610 F.3d at 1264.

If the employer meets this burden of production, the burden shifts back to the plaintiff to show that the stated reason is a mere pretext for unlawful discrimination and was not the "true reason for the employment decision." Burdine, 450 U.S. at 256; see also Alvarez, 610 F.3d at 1264; Holifield v. Reno, 115 F.3d 1555, 1565 (11th Cir. 1997)

("[T]he plaintiff has the opportunity to demonstrate that the defendant's articulated reason for the adverse employment action is a mere pretext for discrimination.") (citing McDonnell Douglas, 411 U.S. at 804)). A plaintiff may satisfy this burden "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." Burdine, 450 U.S. at 256 (citing McDonnell Douglas, 411 U.S. at 804–05). "Despite these shifts in the burden of production, the ultimate burden of persuasion remains on the plaintiff to show that the defendant intentionally discriminated against her." Alvarez, 610 F.3d at 1264. Notably, the Eleventh Circuit has observed that the inquiry does not center "on reality as it exists outside of the decision maker's head." Id. at 1266. Rather, the pretext inquiry focuses on "the employer's beliefs, and not the employee's own perceptions of [her] performance." Holifield, 115 F.3d at 1565.

## IV. Discussion

In seeking summary judgment on Passmore and Thyfault's claims of religious discrimination, 21st Century argues that neither woman has presented direct evidence of discrimination, nor can either woman show that she was subjected to disparate treatment on the basis of her religion. See Passmore Motion at 2; Thyfault Motion at 2. In particular, 21st Century argues that given the undisputed record evidence the Plaintiffs cannot establish a prima facie case because each is unable to show that a similarly situated employee outside of her protected class was treated more favorably. See Passmore Motion at 16-19; Thyfault Motion at 16-19. 21st Century further contends that even if either woman could establish a prima facie case of discrimination, 21st Century terminated each of them for legitimate non-discriminatory reasons. See Passmore Motion

at 2; Thyfault Motion at 2.  Finally, 21st Century argues that neither Plaintiff can establish that 21st Century's legitimate business reasons for terminating them were pretextual. See Passmore Motion at 2; Thyfault Motion at 2.

In response, Passmore and Thyfault generally argue that "material matters for discernment for the jury" exist, particularly in terms of whether 21st Century's stated reasons for terminating each of them were pretextual.  See Passmore Response at 4; Thyfault Response at 4.  Notably, neither Plaintiff presents any argument challenging 21st Century's contention that she failed to establish a prima facie case of religious discrimination.[13]  In this regard, the Court notes that to the extent Plaintiffs contend that Kurz and Schmidt were treated more favorably than themselves, Kurz and Schmidt are not valid comparators.  This is so because they are not "similarly situated in all material respects" to Passmore and Thyfault.  See Lewis v. City of Union City, Georgia, 918 F.3d 1213, 1218 (11th Cir. 2019).[14]

A similarly situated comparator ordinarily "will have engaged in the same basic conduct (or misconduct) as the plaintiff."  Id. at 1227.  Here, Kurz observed the ambulance

---

[13] Both Plaintiffs appear to suggest that because the Court determined at the motion to dismiss stage of this litigation that they had sufficiently pled their prima facie case, they also have satisfied their prima facie burden at this summary judgment stage of the proceedings.  See Passmore Response at 5; Thyfault Response at 4.  Plaintiffs are incorrect.  The standard for granting a motion for summary judgment is different from the standard for granting a motion to dismiss.  See Am. Civil Liberties Union of Fla., Inc. v. Dixie County, Fla., 690 F.3d 1244, 1249 n.1 (11th Cir. 2012); Compania de Elaborados de Cafe v. Cardinal Capital Mgmt., Inc., 401 F. Supp. 2d 1270, 1285 (S.D. Fla. 2003).  At the motion to dismiss stage, a plaintiff may rest on the allegations in his or her complaint.  See Randall v. Scott, 610 F.3d 701, 705 (11th Cir. 2010).  However, at the motion for summary judgment stage of proceedings, a party "may not rest on her pleadings to demonstrate the presence of an issue of fact."  Miranda v. B&B Cash Grocery Store, Inc., 975 F.2d 1518, 1533 (11th Cir. 1992).  Instead, at summary judgment, a non-moving party "must use affidavits, depositions, answers to interrogatories or other evidence to demonstrate that a genuine fact issue remains to be tried."  Retina Assocs., P.A. v. S. Baptist Hosp. of Fla., Inc., 105 F.3d 1376, 1380 (11th Cir. 1997).

[14] At least one of the women, Schmidt, is Catholic and opposes abortion based upon her religious beliefs. Schmidt Deposition at 4.  As such, she falls within the same protected class as Plaintiffs, and cannot serve as a valid comparator.  See Burke-Fowler, 447 F.3d at 1323 (plaintiff must establish, in part, that "her employer treated similarly situated employees outside of her protected class more favorably than she was treated") (emphasis added).

taking away the distressed patient, alerted other employees to the incident, and watched briefly before returning to work. Schmidt also watched for a time before returning to work. It is undisputed that Kurz and Schmidt did no more. In contrast, Passmore and Thyfault did not simply watch the incident. Passmore prompted Thyfault to record the incident and Thyfault recorded it. And Passmore can be heard on the video commenting about Kelly and the patient. Passmore and Thyfault's actions also facilitated the transfer of the video to an individual previously convicted of conspiring to bomb an abortion clinic who posted it to the internet after adding content specifically identifying Kelly and his clinic by name. By no means is the conduct of Kurz and Schmidt "the same basic conduct" as that of Passmore and Thyfault. Moreover, as to Passmore, neither Kurz nor Schmidt had a history of conflict with Kelly resulting in prior counselling. Neither had been warned not to engage in personal activities such as taking pictures or commenting on videos at work, nor had either been told to stay away from Kelly during work hours while on company property. See id. (noting that appropriate comparators "will share the plaintiff's employment or disciplinary history").[15] As such, Plaintiffs have failed to present evidence in support of an element of their prima facie case - that 21st Century treated similarly situated individuals outside of her protected class differently.

Regardless of whether Plaintiffs established a prima facie case, 21st Century has come forward with evidence of a legitimate non-discriminatory reason for terminating

---

[15] Regardless of whether the Plaintiffs presented evidence of an appropriate comparator, "failure to produce a comparator does not necessarily doom the plaintiff's case." Smith v. Lockheed–Martin Corp., 644 F.3d 1321, 1328 (11th Cir. 2011). If the plaintiff presents "a convincing mosaic of circumstantial evidence" to raise a reasonable inference that the decision maker acted with discriminatory intent, summary judgment against the plaintiff is improper. Id. at 1328. Here, Plaintiffs do not assert that this case involves "a convincing mosaic" of circumstances that warrants an inference of discrimination. Nor would such an assertion find any support in the record given the undisputed facts of the case.

Passmore and Thyfault – that in taking and disseminating the video of the distressed patient, both women violated numerous work rules and policies laid out in the Employee Handbook.  See Employee Handbook at 18, 20, 33-34, 37.  In response, Plaintiffs argue that the company's alleged valid reason for terminating them was pretextual, and that the real reason that 21st Century terminated Passmore and Thyfault was the company's discrimination against the women's religious beliefs.  See generally Burdine, 450 U.S. at 256; Alvarez, 610 F.3d at 1264; Holifield, 115 F.3d at 1565.  Thus, the Court will turn to the question of whether there exist genuine issues of material fact as to pretext.  See Armindo v. Padlocker, Inc., 209 F.3d 1319, 1321 (11th Cir. 2000); E.E.O.C. v. Joe's Stone Crabs, Inc., 296 F.3d 1265, 1273 (11th Cir. 2002) ("[W]here the defendant has done everything that would be required of him if the plaintiff had properly made out a prima facie case, whether the plaintiff really did so is no longer relevant.'" (quoting U.S. Postal Serv. Bd. of Governors v. Aikens, 460 U.S. 711, 715 (1983))); Brown v. Davis, 684 Fed. Appx. 928, 935, 937 n.6 (11th Cir. 2017).

In order to show pretext, a plaintiff must "demonstrate that the proffered reason was not the true reason for the employment decision."  Burdine, 450 U.S. at 256.  A reason cannot be a "pretext for discrimination unless it is shown both that the reason was false, and that discrimination was the real reason."  St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515 (1993) (emphasis in original, quotations omitted).  So long as the employer's "reason is one that might motivate a reasonable employer, [the] employee must meet that reason head on and rebut it, and [she] cannot succeed by simply quarreling with the wisdom of that reason."  Chapman v. AI Transport, 229 F.3d 1012, 1030 (11th Cir. 2000); see also Alvarez, 610 F.3d at 1256 ("[The Court does] not sit as a

'super-personnel department,' and it is not our role to second-guess the wisdom of an employer's business decisions — indeed the wisdom of them is irrelevant — as long as those decisions were not made with a discriminatory motive." (quoting Chapman, 229 F.3d at 1030)).  In this regard, an "employer may [take action against] an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason."  Walton v. Cives Corp., 491 Fed. Appx. 29, 32 (11th Cir. 2012) (quoting Nix v. WLCY Radio/Rahall Commc'ns, 738 F.2d 1181, 1187 (11th Cir. 1984), abrogated on other grounds by Lewis, 918 F.3d at 1228-1229).  A plaintiff may demonstrate that an employer's reason is pretextual by identifying "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence."  Combs v. Plantation Patterns, 106 F.3d 1519, 1538 (11th Cir. 1997) (quotation omitted).

Significantly, at this stage, the plaintiff's burden of demonstrating that the employer's proffered reason was not the true reason for her termination "merges with the [plaintiff's] ultimate burden of persuading the court that she has been the victim of intentional discrimination." Burdine, 450 U.S. at 256. Thus, "the question becomes whether the evidence, considered in the light most favorable to the plaintiff, yields the reasonable inference that the employer engaged in the alleged discrimination."  Smith, 644 F.3d at 1325. In this respect, while the absence of a comparator is not fatal to Passmore and Thyfault's Title VII claims, the presence or absence of a comparator is relevant, as is other circumstantial evidence, to whether the women have proven that the adverse employment action was the result of discrimination. Collado v. United Parcel

Serv., Co., 419 F.3d 1143, 1154 (11th Cir. 2005); see also Burke–Fowler, 447 F.3d at 1325 (affirming district court's grant of summary judgment because plaintiff "failed to establish valid comparators and presented no other circumstantial evidence suggesting racial discrimination").

In responding to 21st Century's Motions, Passmore and Thyfault do not dispute that they engaged in the conduct for which 21st Century asserts it terminated their employment.  Nevertheless, they argue that genuine issues of material fact are in dispute regarding whether 21st Century's reasons for terminating them were legitimate, or whether the women were really terminated for their religious beliefs.   In doing so, however, with the exception of noting a dispute about whether in meeting with Thyfault, Burke commented about others having different beliefs, neither Plaintiff identifies any material factual dispute to be resolved by a jury.  See Passmore Response at 4; Thyfault Response at 4.  Instead, they raise a series of questions generally asking whether 21st Century could rightfully deem their admitted actions as violations of the Employee Handbook.  See id.  They ask:

- How would a reasonable person interpret the Employee Handbook?
- Do the handbook's proscriptions reasonably apply to Plaintiffs' actions, or are they used as a pretext to remove employees whose faith based actions are deemed unacceptable?
- Were Plaintiffs' actions based on their religious beliefs?
- Did Ms. Thyfault's taking the video of a medical emergency, permitted by law, harm 21C?
- Was Ms. Burke's alleged statement to Ms. Thyfault discriminatory, terminating her for her beliefs?
- Was co-Plaintiff Passmore's firing indicative of disparate treatment because of her faith, or due to her asking Ms. Thyfault to bring her cell phone to legally capture a real time emergency?
- Is that even a reasonable justification for dismissal according to the handbook?

See id.  Plaintiffs assert that such matters should be left to a jury for "interpretation and discernment."  See Passmore Response at 5; Thyfault Response at 5.  However, upon a full review of the record, and after drawing all reasonable inferences in favor of each Plaintiff, Haves, 52 F.3d at 921, the Court concludes that no reasonable jury could conclude that 21st Century acted with discriminatory intent when it fired Passmore and Thyfault.

Preliminarily, the Court notes that Plaintiffs are simply mistaken in their belief that a jury should determine how a "reasonable person" would interpret 21st Century's handbook or workplace rules, or whether the conduct at issue was a reasonable basis for dismissal.  "Title VII does not take away an employer's right to interpret its rules as it chooses, and to make determinations as it sees fit under those rules."  Nix, 738 F.2d at 1187.  Moreover, the Eleventh Circuit has explained

> Title VII is not a shield against harsh treatment at the workplace.  Nor does the statute require the employer to have good cause for its decisions.  The employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason.  While an employer's judgment or course of action may seem poor or erroneous to outsiders, the relevant question is simply whether the given reason was a pretext for illegal discrimination.  The employer's stated legitimate reason . . . does not have to be a reason that the judge or jurors would act on or approve.

Id.  Thus, Plaintiffs cannot avoid summary judgment simply by suggesting that a jury should consider the reasonableness of 21st Century's actions.  Combs, 106 F.3d at 1543 ("Federal courts do not sit to second guess the business judgment of employers").

Instead, in order to raise a jury question on the issue of pretext, Passmore and Thyfault must point to evidence demonstrating both that 21st Century's proffered reasons for firing them were false, and that the actual reasons were grounded in discrimination

against their religious beliefs.  See St. Mary's Honor Ctr., 509 U.S. at 515; see also Brooks v. Cty. Comm'n of Jefferson Cty., Ala., 446 F.3d 1160, 1163 (11th Cir. 2006) ("A reason is not pretext for discrimination unless it is shown both that the reason was false, and that discrimination was the real reason.") (internal quotation and citation omitted) (emphasis in original).  21st Century's stated reasons for suspending and terminating the women were that while on company property and during work hours, the women video recorded a patient in distress, and then facilitated that recording's placement on the Internet.  Burke Affidavit at 3.  Likewise, as to Passmore, Burke identified the additional reason that Passmore had already been warned several times not to engage in personal activities while at work, and to avoid Kelly.  Id.  21st Century produced evidence that it terminated the women because of the tape recording incident, explaining that they violated various Employee Handbook polices and work rules.  Id. (citing work rules regarding negligence or carelessness endangering the safety of others (Rule 13), making threats of violence (Rule 16), and failing to act in a professional manner (Rule 23)); Burke Affidavit Attachments at 27.  When calling Passmore and Thyfault to inform each of them they had been terminated, Burke told each woman that she was being terminated

> for violating a number of 21st Century's policies including, but not limited to (1) violation of the privacy rights of Dr. Kelly's patient (through [their] comments on the video which identified the medical facility that [the] patient was visiting and speculated as to the reason for her visit) and (2) for making dangerous and unfounded speculation on the video as to the nature of the patient's condition which could put Dr. Kelly's office staff and patients in jeopardy.

Burke Affidavit at 3.  Additionally, Burke informed Thyfault that another reason for her termination was because Thyfault violated the patient's privacy by videotaping the patient leaving Kelly's office.  Id. at 3-4.

The record before the Court demonstrates that 21st Century's stated reasons for terminating Passmore and Thyfault were reasons "that might motivate a reasonable employer." See Chapman, 229 F.3d at 1030. Passmore engaged in personal activities during work hours which she otherwise knew were prohibited, based in part on numerous previous counselling sessions from supervisors. She nonetheless solicited her colleague, Thyfault, to join her and videotape the distressed patient leaving Kelly's clinic. Passmore herself has admitted that it would have been wrong for someone to videotape one of her patients while in distress. During the taping, Passmore referenced putting the video on the Internet, as well as acknowledged that her activities could result in discipline. Likewise, Passmore could be heard on the video saying negative things about Kelly as well as commenting on the patient. Eventually, an edited version of the video was posted on a website associated with an individual convicted of conspiracy to bomb abortion clinics causing complaints and concern by Kelly. No reasonable jury could conclude that such action could not lead a reasonable employer to terminate Passmore and Thyfault for violating any number of 21st Century work rules and policies.

Importantly, Plaintiffs do not dispute that they engaged in the very conduct that led to their terminations. Thus, Plaintiffs point to no evidence creating a genuine issue of fact as to whether 21st Century's stated reasons for their terminations were false. Instead, they quarrel with whether their behavior fits perfectly within the definitions of prohibited employee actions detailed in 21st Century's Employee Handbook. However, to show pretext a plaintiff must "meet the proffered reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason." Brooks, 446 F.3d at 1163. Here, not having disputed that they engaged in the conduct at issue, Plaintiffs

have failed to meet 21st Century's stated reasons "head on," and failed to point to any evidence suggesting that the reasons were false.  See Artiste v. Broward College, 685 Fed. Appx. 805, 806 (11th Cir. 2017) (finding summary judgment appropriate where the employee admitted engaging in the conduct and produced no evidence of discrimination).

In an attempt to argue that 21st Century's proffered reasons for terminating them were pretextual, and otherwise predicated on religious discrimination, Passmore and Thyfault point to the allegedly inconsistent treatment between themselves and Kurz and Schmidt – both of whom also watched the distressed patient being transported from Kelly's practice.  However, as discussed earlier, 21st Century's differential treatment of Kurz and Schmidt does not demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." Combs, 106 F.3d at 1538.  While Kurz and Schmidt joined Passmore and Thyfault to view the distressed patient, perhaps even at Kurz's initial suggestion, neither Kurz or Schmidt initiated taping the patient, nor took steps that resulted in the video being posted on the Internet.  Burke Affidavit Attachments at 25.  Even drawing all factual references in Passmore and Thyfault's favor, the record demonstrates that Kurz and Schmidt's behavior and involvement in the taping incident was markedly different than the conduct of Passmore and Thyfault.  Therefore, 21st Century's differential treatment of the two different sets of women is neither inconsistent nor contradictory such that it could undermine 21st Century's articulated reasons for terminating the Plaintiffs.  See Combs, 106 F.3d at 1538.

The only other evidence to which Plaintiffs point in their attempt to raise a

reasonable inference of 21st Century's discriminatory intent is the alleged exchange between Burke and Thyfault at Thyfault's suspension meeting. While Thyfault herself could not remember with specificity everything stated at the meeting, <u>see</u> Thyfault Deposition at 23, 26, she recalled stating

> "[m]y belief and my faith tells me that . . . you shall not kill . . . when the only way for evil to survive is when good people stay silent" . . . [and] . . . "we know that he is killing babies and hurting women and my faith tells me that that needs to be exposed."

Thyfault Deposition at 23, 26. Thyfault also asserts that in response, Burke stated either that "her beliefs were different than mine," or that "not everybody believes the same as you . . . ." <u>Id.</u> at 23, 26. Although neither Burke nor Simmons recalled religion being discussed during the meeting, for purposes of summary judgment, 21st Century does not contest or dispute Thyfault's recollection of the words exchanged between the two women. Passmore Motion at 9 n.8; Thyfault Motion at 7.

The parties may disagree on the substance and meaning of the exchange between Burke and Thyfault. However, even drawing the inference in the Plaintiffs' favor and assuming Burke's statement implicated Burke's personal disagreement with Thyfault's religious beliefs, this statement does not raise a reasonable inference that 21st Century dismissed the women with discriminatory intent. This lone inference constitutes no more than a scintilla of evidence in favor of Plaintiffs which is insufficient to withstand 21st Century's properly supported motion for summary judgment. <u>Brooks</u>, 446 F.3d at 1162 ("A mere scintilla of evidence supporting the opposing party's position will not suffice, there must be enough of a showing that the jury could reasonably find for that party.") (quoting <u>Walker v. Darby</u>, 911 F.2d 1575, 1577 (11th Cir. 1990)); <u>see also</u> <u>Jackson v. Agency for Persons with Disabilities Florida</u>, 608 Fed. Appx. 740, 743-44 (11th Cir. 2015)

(affirming summary judgment where evidence of timing was no more than a scintilla and could not lead a reasonable juror to find the employer's reason unworthy of credence).

Passmore and Thyfault have failed to identify any evidence in the record from which a jury could conclude that 21st Century's reasons for terminating each of them were false, much less, evidence that the real reason for their terminations was based on religious discrimination.  See Chapman, 229 F.3d at 1014 (noting that to survive summary judgment "a plaintiff must come forward with evidence . . . sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision.").  Because Passmore and Thyfault have failed to identify a genuine issue of material fact regarding pretext, 21st Century's Motions are due to be granted and summary judgment granted in 21st Century's favor.  See Chavez v. Credit Nation Auto Sales, LLC, 641 Fed. Appx. 883, 887 (11th Cir. 2016) (affirming entry of summary judgment where the employee failed to create a jury issue on pretext because the stated reason was true as the employee admitted the conduct – sleeping on the job).

Therefore, in light of the foregoing, it is **ORDERED:**

1. Defendant's Motion for Summary Judgment as to Plaintiff Paula J. Thyfault (Doc. 39) is **GRANTED**.

2. Defendant's Motion for Summary Judgment as to Plaintiff Sally J. Passmore (Doc. 40) is **GRANTED**.

3. The final pretrial conference set for June 6, 2019, is cancelled, and this case is removed from the June 2019 trial term.

4. The Clerk of the Court is directed to enter **JUDGMENT** in favor of Defendant 21st Century Oncology, LLC and against Plaintiffs Sally J. Passmore and Paula J. Thyfault.

5. The Clerk of the Court is further directed to terminate all pending motions and close the file.

**DONE AND ORDERED** in Jacksonville, Florida this 30th day of May, 2019.

MARCIA MORALES HOWARD
United States District Judge

lc26

Copies to:

Counsel of Record